# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ROVER PIPELINE, LLC, | ) | CASE NO. 5:17-CV-239 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| 10.55 ACRES OF LAND, MORE OR LESS, | ) | |
| IN ASHLAND COUNTY, OHIO, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Several motions are pending in this condemnation case concerning the property owned by defendants Roger and Rita Dush ("the landowners"). Plaintiff Rover Pipeline, LLC ("Rover") moves to exclude the expert testimony of Cathy Roche ("Roche") on lost profits (Doc. No. 691) and the expert testimony of Mark D. Koeninger ("Koeninger") and Eric J. Gardner ("Gardner") on potential impact radius ("PIR") and stigma associated with the presence of a gas pipeline on the condemned property. (Doc. No. 693.) The landowners seek to exclude the expert testimony of Rover's rebuttal experts Richard D. Huriaux ("Huriaux") and Mike Israni ("Israni") (Doc. No. 694); the expert testimony of Rover's arborist, Alan D. Klonowski ("Klonowski") (Doc. No. 695); and the expert testimony of rebuttal expert Rebekah A. Smith ("Smith"). (Doc. No. 696.) The motions are fully briefed, and the Court conducted an evidentiary hearing on August 27, 2018 and August 28, 2018.

## I. BACKGROUND

On February 6, 2017, Rover brought this action pursuant to the Natural Gas Act ("NGA") and under the procedural framework of Federal Rule of Civil Procedure 71.1. By this action, Rover sought condemnation of approximately 700 tracts of land located within this judicial district and through which it intended to construct a pipeline, having previously received a certificate from the Federal Energy Regulatory Commission ("FERC") and having reached settlement with the majority of property owners along the route of the proposed pipeline. Following numerous hearings and mediation sessions, Rover arrived at an agreement with all defendants on the issue of immediate possession, and it reached agreement with all but a few property owners, including the landowners, on the issue of compensation. The Court determined that a jury would resolve the issue of compensation for the remaining tracts. The Court has scheduled a jury trial on the issue of compensation for the landowners' property for September 17, 2018.

The present parcel being condemned consists of approximately 7.528 acres of land in Wayne County, Ohio (the "Property"), which includes a temporary construction easement and a smaller permanent easement. The Property is part of a larger tract of land that totals more than 100 acres and is owned by the landowners. During construction, Rover utilized a 150-foot wide easement of the Property to construct and install the pipeline. This initial easement occupied a total of 3.4199 acres. Within the initial easement was a smaller 60-foot wide permanent easement that is currently being used by Rover to operate and maintain its pipeline. The permanent easement, which is the only easement currently in place on the Property, occupies approximately 1.3719 of the 7.528 acre tract. Because the pipeline is buried a minimum of four feet underground on the Property, the landowners are permitted to continue to utilize the 60-foot

permanent easement area for certain limited purposes including farming, utility construction, driveway cross, and other uses not inconsistent with Rover's operation and maintenance of the pipeline.

The parties agree that the Property and the adjoining farm acreage that makes up the 100 acres are utilized as a collective unit to grow Christmas trees. (Doc. No. 695 at 10338.[1]) The business—"The Farms at Pine Tree Barn"—is organized as a Chapter S Corporation with the landowners owning 100% of its stock. "The Farms at Pine Tree Barn focuses on providing people with a memorable Holiday experience wherein individuals and families go into the field, on a horse drawn carriage, and cut down their own Christmas trees." The Farms at Pine Tree Barn grows, among other trees, "the highly coveted Fraser fir tree, which is not indigenous to Ohio." (*Id*.) According to the landowners, this particular species of evergreen tree requires a specific combination of soil composition and growing conditions that were present on the Property prior to the installation of the pipeline. It is the landowners' position that, after the installation of the pipeline and what it views as Rover's inadequate remediation efforts, "commercially marketable Fraser fir trees will no longer grow on the" Property.[2] (*Id*.)

In anticipation of the trial on compensation, the parties have identified approximately ten expert witnesses. These witnesses intend to provide opinions on a variety of topics ranging from soil and horticulture to real estate and economics. The present in limine motions address the admissibility of the opinions of several of these witnesses.

---

[1] All page numbers, with the exception of deposition citations, refer to the page identification number generated by the Court's electronic docketing system. For the sake of clarity, deposition citations refer to the page number assigned by the transcribing court report.

[2] The property owners also maintain that they were forced to prematurely harvest the Christmas trees that were gowning on the Property. Because the growth cycle for Christmas trees is several years, the landowners insist that the loss from these trees, alone, is substantial.

## II. LEGAL STANDARDS

### A. Motions in Limine

Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Civil Procedure, the practice of ruling on motions in limine "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions in limine allow the court to rule on evidentiary issues prior to trial in order to avoid delay and focus pertinent issues for the jury's consideration. *See United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999); *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir. 1997).

Courts should exclude evidence on a motion in limine only when it is clearly inadmissible. *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). If the court is unable to determine whether or not certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in proper context. *Id*. Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court. *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008) (citing *United States v. Certain Lands Situated in the City of Detroit*, 547 F. Supp. 680, 681 (E.D. Mich. 1982)). In limine rulings are preliminary, and the district court may change its ruling at trial for any reason it deems appropriate. *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994).

### B.    Rule 702

The parties' motions are governed by Rule 702 of the Federal Rules of Evidence. Rule 702 allows an expert witness to provide testimony in opinion form if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Supreme Court has interpreted this rule to require judges to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). These prerequisites apply to not only "'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (quoting Fed. R. Evid. 702). Thus, "*Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citation omitted).

Although there is "no definitive checklist or test" to strike this balance, relevant factors include: (1) whether a theory or technique "can be (and has been) tested;" (2) whether a "theory or technique has been subjected to peer review and publication;" (3) the "known or potential rate of error;" and (4) whether the theory or technique is generally accepted. *Daubert*, 509 U.S. 593-94 (citations omitted). These factors are not exhaustive and the inquiry is "a flexible one," *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011) (citations omitted), for districts courts must be mindful that "the gatekeeping inquiry must be 'tied to the facts of a particular case.'"

*Kumho*, 526 U.S. 150 (quoting *Daubert*, 509 U.S. at 591) (internal quotation marks omitted). Notwithstanding this individualized inquiry, a district court is not "required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nelson v. Tenn. Gas Pipeline Co*., 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139, L. Ed. 2d 508 (1997)). Finally, "it is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Id*. at 251 (citing *Daubert*, 509 U.S. at 592 n.10).

### III. JUST COMPENSATION—GUIDING PRINCIPLES

The Fifth Amendment of the United States Constitution provides that no private property shall be taken for public use without "just compensation." U.S. CONST. amend V. "The measure of compensation is the value of the property at the time of the taking. The owner of the property is entitled to receive 'what a willing buyer would pay in cash to a willing seller.'" *United States v. 25.202 Acres of Land*, 860 F. Supp. 2d 165, 174 (N.D.N.Y. 2010) (quoting, among authority, *United States v. Certain Land Situated in the City of Detroit*, 148 F. Supp. 2d 863, 870 (D. Mich. 2001)); *see United States v. 104 Acres, More or Less, in Keeler Twp. (Van Buren)*, 666 F. Supp. 1017, 1020 (W.D. Mich. 1987) ("In most cases, just compensation means 'the fair market value of the property on the date it is appropriated.'") (quoting *Kirby Forest Indust, Inc. v. United States*, 467 U.S. 1, 10, 104 S. Ct. 2187, 2194, 81 L. Ed. 2d 1 (1984)); *see also Olson v. United States*, 292 U.S. 246, 255, 54 S. Ct. 704, 78 L. Ed. 1236 (1934) (a land owner is entitled to receive "the market value of the property at the time of the taking contemporaneously paid in money"). Moreover, the amount of compensation "includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from the taking, embracing,

of course, injury due to the use to which the part appropriated is to be devoted." *United States v. Grizzard*, 219 U.S. 180, 183, 31 S. Ct. 162, 55 L. Ed. 165 (1911). The Fifth Amendment guarantee of "just compensation" contains an element of equity, as its focus is to place the owner in as good a financial position as if the property had not been taken. *Olson*, 292 U.S. at 255. Nonetheless, "overcompensation is as unjust to the public as undercompensation is to the property owner . . . ." *United States v. L. E. Cooke Co., Inc.*, 991 F.2d 336, 341 (6th Cir. 1993) (citation omitted).

Fair market value is determined by considering what a "rational seller, willing but not obligated to sell, would take for the property, and what a rational buyer, willing but not obligated to buy, would pay for the property, and must take into account '[a]ll considerations that might fairly be brought forward and given substantial weight in bargaining between an owner willing to sell and a purchaser desiring to buy.'" *Van Buren*, 666 F. Supp. at 1020 (quoting *United States v. 1, 291.83 Acres of Land*, 411 F.2d 1081, 1084 (6th Cir. 1969) (further citations omitted)). "A court must also consider 'the highest and most profitable use for which the property is adaptable and needed, or is likely to be needed in the near future.'" *Id.* (quoting *1,291.83 Acres of Land*, 411 F.3d at 1084); *see Olson*, 292 U.S. at 255. "Generally, the highest and best use of a property is presumed to be the property's current use, but it can also be a future use if the property has a future use which may be anticipated with reasonable certainty." *Rockies Exp. Pipeline, LLC v. Burtle*, 492 F. App'x 666, 670 (7th Cir. 2012) (quotation marks and citation omitted); *see Cooke*, 991 F.2d at 341 ("In the absence of proof to the contrary, the current use is presumed to be the best use.") (citation omitted); *see also Olson*, 292 U.S. at 255 (The Court must consider the highest and best use of the property, either in its current state or for what it is likely to be needed in the reasonably near future, not necessarily 'as the measure of value, but to the full extent that

the prospect of demand for such use affects the market value while the property is privately held.") (citations omitted). "[H]owever, speculative and remote possibilities cannot become a guide for the ascertainment of value, especially when the creation of such a potential use would require a substantial investment of capital." *Cooke*, 991 F.2d at 341 (quotation marks and citation omitted).

In cases, such as this, involving a partial taking of a property owner's land rights, the "Sixth Circuit has indicated" that a district court "should employ a three step method of analysis. First, it should determine the before taking value of the property. Second, it should determine the taking value of the property lying within the easement. Finally, it should determine the incidental damages, arising from the easement, to any land adjacent to the easement." *Van Buren*, 666 F. Supp. at 1020 (citing *United States ex rel. TVA v. An Easement and Right of Way 200 Feet Wide and 3,435 Feet Long Over a Tract of Land in Madison County, Tenn*., 405 F.2d 305, 307 (6th Cir. 1968)); *see also Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement*, 962 F.2d 1192, 1199 (6th Cir. 1992) ("As a general rule, the correct measure of valuation of a partial taking of property is the difference between the property's fair market value immediately before and after the taking.")[3] (citations omitted).

---

[3] In fact, where the property shares a common and integrated use with other tracts, the weight of authority would provide that both the before and *after* analysis should consider the entire fee. *United States v. Certain Land Situated in City of Detroit*, 188 F. Supp. 2d 747, 751 (E.D. Mich. 2002) (collecting cases, including *United States v. 1,162.65 Acres of Land*, 498 F.2d 1298, 1300 (8th Cir. 1974) ("[T]he applicable working rule requires that if, on the facts of a particular case, it is determined that the particular tracts condemned were, at the time of taking, in fact being used and devoted to a unitary use together with another tract, the tracts taken and the tracts not taken must be considered as a single unit in both the before and after valuations")); *see also United States v. 287.89 Acres of Land, More or Less, in Clearwater Cnty*., 241 F. Supp. 464 (W.D. Pa 1965) ("In determining just compensation in this case for the taking of one of three tracts of land which were in the same ownership and in fact have been used and treated as a unit, we think it is the law that they should be treated as a unit in estimating damages.") (citations omitted). Because the landowners concede that the condemned land was dedicated to a unitary use with the remainder, consideration of the value of the entire fee—both before and after the taking—would be appropriate. (*See* Doc. No. 695 at 10338 ["The Farms at Pine Tree Barn specialize in growing Christmas trees on the [] Property, and *the adjoining farm acreage operated as a collective economic unit*…."] (emphasis added)).

Federal courts apply "'the law of the state in which the condemned property is located in determining the amount of compensation due.'" *Rockies Exp. Pipeline LLC v. 4.895 Acres of Land*, 734 F.3d 424, 429 (6th Cir. 2013) (quoting *Columbia Gas Transmission Corp*, 962 F.2d at 1199). In *Am. Energy Corp. v. Rockies Exp. Pipeline LLC*, 622 F.3d 602, 606-07 (6th Cir. 2010), the Sixth Circuit had occasion to summarize the relevant Ohio law:

> Under Ohio law, the landowner in an eminent domain action is entitled both to the value of the land taken and to "damages" to the "residue" of the property. *City of Norwood v. Forest Converting Co*., 16 Ohio App. 3d 411, 476 N.E.2d 695, 700 (1984). Damages to the residue compensate for "any injury that may result to the remaining lands by reason of the construction of the proposed improvement," measured by the difference in the residue's fair market value before and after the taking. *Id*. A court determining fair market value should take into consideration "every element that can fairly enter into the question of value." *Sowers v. Schaeffer*, 155 Ohio St. 454, 99 N.E.2d 313, 317 (1951).

## IV. ROVER'S MOTIONS

### A.     Lost Profits

As an initial matter, Rover seeks to exclude all testimony of lost profits proffered by the landowners, including any and all testimony of the landowner's business valuation expert, Cathy Roche. It is Rover's position that "consideration of lost profits is not permitted when calculating fair market value in condemnation actions under the Fifth Amendment and well-established case law from the Supreme Court of the United States[.]" (Doc. No. 691 at 9935.) The landowners insist that lost profits are available under federal and Ohio law.

As a general rule, federal courts have refused to consider income generated by, or the "going concern" value of, businesses that are condemned. *See United States v. Gen. Motors Corp*., 323 U.S. 373, 379, 65 S. Ct. 357, 89 L. Ed. 311 (1945) (Compensation for a fee taking by the government "does not include future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of good-will which inheres in the

9

location of the land . . . ."); *see also Kimball Laundry Co. v. United States*, 338 U.S. 1, 11, 69 S. Ct. 1434, 93 L. Ed. 1765 (1949) (denial of going concern damages rests on the principle that a business owner can move his business). But "the Supreme Court has steadfastly refused to declare any hard and fast rules in eminent domain cases." *Certain Land Situated in Detroit*, 148 F. Supp. 2d at 879-80 (collecting cases where the Supreme Court carved out exceptions to the general prohibition on awarding lost profits). Additionally, even where the Supreme Court has found that lost profits and other going concern damages are not available in condemnation proceedings, it has recognized that a loss in the income generating power of the property would be relevant to a potential buyer and, therefore, should inform the fair market analysis. *See Gen. Motors Corp.*, 323 U.S. at 379.

Ohio follows the general rule that lost profits are *usually* not available in condemnation. "The business-losses rule is a judicial construct that holds that the power of appropriated property may not be compensated for the loss of future profits from any commercial enterprise on the property." *Cincinnati v. Banks*, 757 N.E.2d 1205, 1215 (Ohio App. Ct. 2001) (citing, among authority, *Preston v. Stover Leslie Flying Serv. Inc.*, 190 N.E.2d 446 (Ohio 1963)). Like its federal counterpart, the Ohio rule against awarding lost profits is not absolute and "requires the trial court to 'look to the evidence to determine whether it is of such a character as to take the determination of [lost future profits] out of the field of speculation. Thus, compensation for lost future profits may be permitted if such profits can be proven with reasonable exactitude." *Id.* at 1216 (quotation marks and citations omitted); s*ee Columbia Gas Transmission Corp.*, 962 F.2d at 1199 (similar) (citing *Preston*, 190 N.E2d at 450).

As potentially applicable to this case, lost profits have been found to be relevant where the business' profitability was "attributable to the property's unique location, rather than the

business acumen of its owners." *Cincinnati*, 757 N.E.2d at 1215 (citing *Wray v. Hart*, No. 91CA20, 1992 WL 208900 (Ohio App. Ct. Aug. 13, 1992) ("exceptions to the general rule precluding evidence of business income occur when the character of property is such that a profit is produced without regard to the labor of the owner, where the profits derived from its use are the chief source of its value, or where the property is so unique as to make any comparable sales data unavailable")). In *Wray*, for example, the court found that lost profits were relevant because the "record was replete with evidence" that the property was unique and that the lottery sales on the property were largely the result of the location such that truly comparable sales were unavailable. *Wray*, 1992 WL 208900, at *7.

Given that federal and state law permit the award of lost profits in limited circumstances, and further recognizing that the overall goal of the just compensation guaranteed by the Fifth Amendment is equitable in nature and designed to make the landowner whole, the Court refuses to exclude, as a matter of law, all evidence of lost profits.

### B. Landowners' Piecemeal Approach

Rather than applying Ohio law to determine the before and after value of the fee, and factoring in any incidental damages from the taking, the landowners have chosen to separate the Property from the business and value each individually, something that even Roche testified could not be done, given the business's connection to and interdependence with the land. (Doc. No. 718 (Hearing Transcript ["Tr."]) at 11247-48.) Specifically, the landowners asked Eric J. Gardner, a certified real estate appraiser, to treat the condemned property as if it were a vacant lot and then value this vacant lot before and after the taking. (Tr. at 11084.) Upon a determination that the highest and best use of the property before the taking was for residential

development, Gardner opined that prior to the taking the condemned property alone was worth $135,000. (Tr. at 11077, 11082, 11085-86.) Then, relying on Mark D. Koeninger's PIR/stigma analysis, which will be addressed *infra* and recognizes a stigma attached to property through which a pipeline runs, he determined both that the highest and best use was now as green space and that its value had dropped to $0.00. (Tr. at 11087, 11093, 11104, 11106-07.)

Then the landowners asked Roche to provide an analysis of the Christmas tree business. Assuming that no trees (including the Fraser fir) would ever be grown on the Property again, she valued the business under three different approaches—the asset approach, the market approach, and the income approach. According to Roche, the first two approaches resulted in a loss to the landowners of $167,000 and $157,000 respectively. Finding that the "income approach" best captured the loss from the easement, however, Roche determined that the loss to the landowners was actually $888,000. (Doc. No. 691-1 (Expert Report of Cathy Roche ["Roche Report"]) at 9994.)

Without even getting into the factual basis and the methodology supporting each expert's opinions, the Court finds that this piecemeal approach does not meet the Rule 702 standard for admission of expert evidence. First, because the approach does not value the actual property, before and after the taking, it will not assist the jury in their assigned task. Separate analyses of a vacant lot, and an unattached business will not inform the jury on the decrease in the value of the property, as improved by the business, before and after the condemnation.

Moreover, this is not a "business taking" under the law. *Cf. Kimball Laundry Co*, 338 U.S. at 3 (government appropriated laundry for temporary use by the military); *Certain Lands in City of Detroit*, 148 F. Supp. 2d at 880 (valuation of duty-free business on condemned property appropriate where the government's "taking of Defendant's property is akin to the situation in

which the Government condemns property with the intention of carrying on the business of the condemnee").While the condemnation of the property in this case may have compromised the Christmas tree business, it was not tantamount to the government (or Rover in its stead) taking over the business.

Second, this "divide and conquer" approach has resulted in a loss value that, when added together, far exceeds the value of the fee, even when incidental damages are factored in.[4] However, under Ohio law, a landowner's total damage award—combining the value of the taken land and any damages to the residue—cannot exceed the total before construction fair market value of the residue. *Sowers v. Schaeffer*, 99 N.E.2d 313, 316 (Ohio 1951) ("in fixing compensation for property taken by appropriation proceedings, the total award should not be less than the fair market value of the property to be appropriated *but it cannot exceed the fair market value of the property as a whole*") (emphasis add). Such an understanding of the outer limits of damages in condemnation is consistent with federal law. *See United States v. 6.45 Acres of Land*, 409 F.3d 139, 146-47 (3d Cir. 2005) ("In prescribing [the before and after rule], we have explained that the value of the separate interests cannot exceed the worth of the whole.")

Finally, the approach has resulted in internal inconsistencies that could not be easily reconciled by a fact-finder. For example, while Gardner and Koeninger each opined that the highest and best use of the property was for residential development—a position that runs contra to the presumption in favor of the current use being the highest and best use—Roche opined that the highest and best use was as a Christmas tree farm. (Roche Report at 9982; Doc. No. 693-2 (Expert Report of Eric J. Gardner ["Gardner Report"]) at 10236-7; Tr. at 11016, 11082, 11086.)

---

[4] This result is not surprising given that both experts factored into their analyses the impact of the pipeline. By double-counting the anticipated damage from the pipeline, the landowners were able to over-represent their losses.

In another apparent contradiction, it was Roche's opinion that the income approach best estimated the value of the Christmas tree business both before and after the taking. (Roche Report at 9994.) Gardner, on the other hand, believed that the income approach was an inappropriate (or less appropriate) method of valuing the landowners' type of business. (Tr. at 11097-98.) In both instances, the jury would be left with the task of reconciling seemingly irreconcilable opinions of the landowners' own experts in order to accept any part of the landowners' valuation expert evidence.

In combination, these reasons illustrate the fatal flaws in the landowners' approach, and demonstrate why the expert opinions of Gardner and Roche will not "help the trier of fact to understand the evidence or to determine a fact or data" necessary to award just compensation in this case. Fed. R. Evid. 702. For this reason alone, the expert opinions of Gardner and Roche are excluded.

### C.     Experts  Mark D. Koeninger and Eric J. Gardner

The Court now turns to the other Rule 702 requirements for expert testimony. The cornerstone of Koeninger's expert report is his PIR analysis. Koeninger, who is an architect by training and experience, explained that the PIR is defined solely by federal regulation and "is an area around any high pressure pipeline transporting hazardous materials. The PIR is defined as the area where if the pipe should impact, there could be loss of life and/or property within the PIRA area (*as defined by the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration Regulations*). (Doc. No. 693-1, Expert Report of Mark D. Koeninger ["Koeninger Report"]) at 10195) (emphasis in original). He then offers his opinion that "any potential developer or agri-business owner, realizing the fact that the PIR will encumber **100%** of the Dush property, will have concerns over the risks of property damage and

14

injuries to persons and property that could result from a pipeline explosion." (*Id.*, emphasis in original). "These concerns[,]" Koeninger surmises, "will cause potential developers to look at other unencumbered property," rendering the Dush's property essentially valueless for residential development. (*Id.*) Gardner, in turn, relied on Koeninger's PIR analysis to formulate his valuation of the Property. (Gardner Report at 10216.)

Koeninger's report fails to explain the basis for his conclusion that the existence of a PIR on the Property, as defined by federal regulations,[5] would substantially decrease the value of the Property. In fact, the Koeninger Report is devoid of any support for its author's opinion. Further, at the hearing, Koeninger admitted that he did not rely on sales along the Rover Pipeline and, in fact, conceded that his opinion was not based on any objective facts or data that would suggest that potential property purchasers would be disinclined to purchase property because of the existence of Rover's pipeline. (Tr. at 11023-25, 11065, 11070-71.)

Before an individual can give expert testimony, Rule 702 requires that the testimony be "based on sufficient facts or data[.]" Fed. R. Evid. 702(b); *see Cooke*, 991 F.2d at 342 (Expert testimony necessarily requires a "reasonable factual basis" to avoid exclusion.). In *Rockies Exp. Pipeline LLC v. Hopkins*, No. 1:08-CV-751-RLY-DML, 2012 WL 1622532, at *4 (S.D. Ind. May 9, 2012), the court rejected expert testimony that a pipeline caused "stigma" and land value reduction because the expert failed to present any objective sales data to support such an

---

[5] Instead, he said that his "conclusions were based on" the determination of a PIR on the property. (Tr. at 11024, 11040, 11044, 11045 ["I did not rely on anything other than the Department of Justice regulations in my report for PIR"].) Yet, Koeninger admitted that the PIR is not an "architectural issue." (Tr. at 11042.) He explained that the purpose of the PIR determination is to identify properties for which an integrity management program would need to be established. (Tr. at 11031.) Rover agrees the PIR is a technical tool used for pipeline integrity management, and that it is not a real estate valuation tool. In fact, it intends to offer the expert testimony of Huriaux and Israni on the origins of the PIR under the federal regulations to attack Koeninger's use of the PIR in establishing property value. Because the Court finds that Koeninger's testimony does not satisfy Rule 702, it need not reach the propriety of Rover's rebuttal testimony. Still, it is clear that the injection of PIR evidence in this case would have likely resulted in a mini-trial on federal pipeline safety regulations and detract from the jury's task of determining compensation.

assumption and "did not conduct any market analysis pertinent to the issue[.]" The court reasoned that, if such a stigma existed, "[o]ne would expect" that "some market data would exist to evidence that." *Id*. at \*5. Similarly, a district court in the Southern District of Ohio considered but ultimately rejected as unpersuasive Koeninger's PIR/stigma testimony because it was premised on an "insufficient factual basis[.]" *See Rockies Exp. Pipeline LLC v. 4.895 Acres of Land*, No. 2:08-CV-554, 2011 WL 1043493, at \*1-2 (S.D. Ohio Mar. 16, 2011) ("This leaves the PIR approach an interesting theory that lacks persuasive force under the circumstances of this case.").

The landowners underscore the fact that the commission in *4.895 Acres of Land* did permit Koeninger and Gardner to offer PIR testimony even if it, and the district court that reviewed the commission's recommendations, ultimately rejected the testimony as unpersuasive. *See id.* at \*1 ("The commission did not adopt a position that it was unwilling to entertain the PIR concept; rather, the Commission reasonably rejected the PIR analysis because the preponderance of the evidence undercut its application under the facts presented.").They also note that other courts have permitted Koeninger and others to offer PIR stigma testimony in condemnation cases. *See, e.g., Vector Pipeline, LLC v. 68.55 Acres of Land*, 157 F. Supp. 2d 949, 957 (N.D. Ill. 2001) (allowing testimony of "stigma effect" of pipeline from "experienced and qualified appraisers").

With respect to proffered expert testimony, this Court is required to perform its own gatekeeper duties by evaluating the opinions in light of the record in the case before it and the requirements of Rule 702 and relevant case law. While there may be situations where expert testimony on the issue of PIR stigma may be properly admitted to support a property valuation, the record fails to support the introduction of such evidence here. Koeninger's opinion testimony

is not support by *any* facts or relevant sales or market data.[6] Expert testimony may not be based on mere speculation, and assumptions must be supported by evidence in the record. *Lozar v. Birds Eye Foods, Inc.*, 529 F. App'x 527, 530-31 (6th Cir. 2013) (rejecting expert testimony that was not supported by, and was actually contradicted by, the available sales data). Further, reliability under Rule 702 requires that an expert's opinion not have "too great an analytical gap between the expert's conclusions, on the one hand, and the data that allegedly supports it, on the other."). *Id.* at 530 (quotation marks and citations omitted). Because Koeninger is unable to bridge the analytical gap between his conclusion and any facts that would have lent support for his conclusion in this case, the PIR remains an "interesting theory" that finds no application here.[7] Accordingly, Koeninger's testimony, as well as Gardner's testimony that was based on Koeninger's PIR analysis, are excluded. (*See* Tr. at 11106-07.)

### D. Expert Cathy Roche

Even though the Court has rejected Rover's overly broad position that evidence of "lost profits" is never relevant in condemnation proceedings, it has determined that Roche's testimony

---

[6] At the motion hearing, Koeninger referenced the Guardian Pipeline Study, a telephone survey made to several hundred landowners inquiring about whether the existence of a hypothetical pipeline might influence a future land purchase. Koeninger did not reference this study in his report or offer it as the basis for the conclusions he offers in his report. (Tr. at 11021, 11070.) At the hearing, Koeninger also mentioned his general experience, not involving sales along Rover's pipeline, but involving what he perceived as delays in selling property encumbered by pipelines. This, too, was not mentioned in the report. Moreover, Koeninger was emphatic at the hearing that he relied *solely* on the identification of a PIR on the condemned property. (Tr. at 11024, 11040, 11044, 11045.) Accordingly, even if the Court were to acknowledge the study and Koeninger's general experience as relevant on the subject of PIR stigma, it would not lend credit to the opinion Koeninger offers in this case.

[7] Additionally, unlike the "qualified appraisers" that offered the stigma testimony in *Vector*, the landowners fail to demonstrate how Koeninger—an architect with no appraisal training or experience with pipeline construction or regulation—is qualified under Rule 702 to offers such an opinion. (Tr. at 11013-15.) However, even if he were qualified and his opinion was based on his experience, he still was required to explain how that experience lead him to the conclusion he reached. *See* Fed. R. Evid. 702 Advisory Committee note, 2000 amend. ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the experts word for it.'")

would not assist the jury in fixing just compensation in this case. Additionally, the Court finds that Roche's income approach analysis is unreliable because the methodology employed is fatally flawed and not supported by a sufficient factual basis.

At the outset, the Court finds that Roche failed to apply the generally accepted definition of fair market value to her business valuation calculations. It is well settled that the fair market value is defined as "what a willing buyer would pay in cash to a willing seller" if both were in the position to bargain freely and had reasonable time to negotiate and explore alternatives. *United States v. Miller*, 317 U.S. 369, 374, 63 S. Ct. 276, 87 L. Ed. 336 (1943). Moreover, for purposes of Fifth Amendment compensation, this valuation must be calculated as of the time of the taking. *See First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles Cnty., CA*, 482 U.S. 304, 319-20, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1978).

While the report cites the proper standard, Roche testified in her deposition that valuation can vary depending on the "purpose of the valuation." (Doc. No. 691-2 (Excerpts from Deposition of Cathy Roche ["Roche Dep."]) at 81.) When asked what she understood the purpose of her valuation in this case to be, she responded that it was "[t]o value the business before and after the pipeline." (*Id.*) At the motion hearing, Roche further clarified that her valuation focused on the perceived value of the property to the landowners. (Doc. No. 718 (Hearing Transcript ["Tr."]) at 11197; *see id.* at 11148, 11153, 11215-16, 11244.)[8] In fact, in cross-examination, Roche underscored the fact that certain assumptions she made in arriving at her calculations were based upon her assumption that there would be no sale. (*Id.* at 11215-16.) Rather than applying the well accepted definition of fair market value that would consider the

---

[8] In explaining that a company's specific risk can vary, Roche noted that she assigned a company specific risk factor of zero to the business because she was valuing "the fair market value of the business for the Dushs." (*Id*. at 11197.)

value to a willing purchaser at the time of the taking, it would appear that Roche determined the continued value to the landowners after the installation of the pipeline. Because Roche's employed methodology was not designed to determine the fair market value of the property, her conclusions would not assist the jury in their task.[9] *Cf. In re Neal*, No. CIV 06-421-TUC-CKJ, 2008 WL 6759954 (D. Ariz. Sept. 30, 2008) (expert testimony would assist the jury, and was not subject to exclusion under Rule 702, where standard applied by expert in determining fair market value was substantially equivalent to the standard for determining the distressed value of the property).

However, the Court finds even more disturbing the fact that her valuation under the income approach fails to deliver a conclusion that has any indicia of reliability. In particular, Roche's determination of the "capitalization rate" is entirely suspect. The "capitalization (or discount) rate" is the "required rate of return that an investor would demand—based on the risks associated with the benefit stream under consideration—to induce him or her to make the investment." (*Understanding Business Valuation—A Practical Guide to Valuing Small to Medium Sized Businesses*, Fifth ed., Gary R. Trugman, at 513.) The parties agree that Roche utilized a "build-up method," which factors into consideration long-term sustainable growth and a variety of risks associated with the business and the industry in arriving at the capitalization rate.

---

[9] Rover also complains that Roche fails to explain why she rejected the asset approach, which is generally accepted to be the preferred method of valuation, for an approach that yielded a result more than five times greater. While Roche acknowledged that the asset approach was an acceptable method of valuation, she also testified at the hearing that the income approach permitted the analyst to look at the income that is being produced by all of the involved assets involved in the business. (Tr at 11165, 11211.) While this explanation might be fodder for cross-examination, it would not be a reason to exclude the testimony.

Roche applied the "risk free rate of return" and "equity risk premium" she found in Duff & Phelps, a recognized guide in business valuation, but rejected the Duff & Phelps number for small stock risk premium of 5.9 %, opting for a 1% figure instead.[10] (Tr. at 11196.) The impact of the decision to apply a 1% for small stock risk premium was significant, as when the Duff & Phelps's 5.9% number is applied, the business valuation—even without any other changes in the calculation—is reduced from $888,000 to $338,787.[11] (Tr. at 11196, 11201.)

At her deposition, Roche offered no explanation for why she used the "generally accepted" Duff & Phelps numbers when they raised her valuation but ignored the guide's suggested number when it lowered her valuation. (Roche Dep. at 76-77.) She further admitted that she did not rely on any other "authoritative guide" in selecting the 1% figure. (*Id*. at 82.) At the hearing, Roche testified that she relied on information she received at a continuing education class she attended 2015 that was presented at a conference of the National Association of Certified Valuation Analysts. (Tr. at 11189-90.) She admitted that she did not provide any of the materials from this course, and her report does not reference this unnamed course. (*Id.* at 11190.) Nonetheless, she explained on cross-examination that the course instructor's presentation on risk evaluation was persuasive, and that a copy of the industry-specific breakdown of risk premiums prepared for the seminar is "pinned up on my board at the office, and I just refer to it as I am going through business valuation." (*Id*. at 11221.)

It is evident that Roche relied substantially on information she received at an unidentified seminar in arriving at the risk factors she selected for her valuation which, in turn, resulted in her

---

[10] The Court also questions Roche's decision to use the first two Duff & Phelps risk numbers, as Roche admitted that they are reserved for much larger companies worth between 2.3 and 5.6 billion. (Tr. at 11194, 11196.)

[11] Roche also admitted that she overlooked or missed an appropriate multiplier for agricultural businesses, set forth in an authoritative guide known as Orion, and inexplicitly relied on a multiplier three times greater. (Tr. at 11174.)

use of multipliers that varied considerably from the established and accepted industry guides identified at the hearing. Unfortunately, the Court cannot evaluate Roche's reliance on an unnamed seminar or the unseen documents created for the seminar. In the absence of any reassurance that Roche's reliance on this seminar and its teachings is grounded in sound valuation principles, accepted in the industry, the Court is left with nothing more than the "ipse dixit" of the expert. *See Nelson*, 243 F.3d at 254; *Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013) (It is especially appropriate to reject speculative expert opinions "where a field is characterized by established standards for arriving at expert conclusions and a proposed expert fails to engage with those standards, departs from them in a report, or cannot cite published works in support of a position.") (citing *Dev. Specialists, Inc. v. Weiser Realty Advisors LLC*, No. 09 Civ. 4084, 2012 WL 242835, at *8 (S.D.N.Y. Jan. 24, 2012)). Given the fact that this decision resulted in a calculation that was several times what the other two valuation methods yielded, Roche's inability to adequately explain or defend her calculation is decidedly troubling.

With respect to company-specific risk, Roche testified that she assigned a pre-taking "company specific risk premium" of 0% to the property, notwithstanding the fact that she admitted that there is always risk in any business. (Tr. at 11199-99; Roche Dep. at 104.) Additionally, while she acknowledged that the risk for an agricultural property—such as The Farms at Pine Tree Barns—included pests, drought, floods, and other weather-related conditions, she explained that she did not take them into consideration because "the Dushs monitor that risk or pay for that risk on a year-to-year basis." (Tr. at 11199; Roche Dep. at 104.) She then applied a 2% company specific risk premium post-taking to account for any problems associated with the construction and maintenance of the pipeline on the property. Yet, she was unable to identify any

generally accepted treatises, literature, or other reference sources from the real estate or business valuation industry that would support assigning a company-specific pre-taking risk of 0% or a 2% post-taking risk.[12] Instead, she simply explained that relevant "literature" permitted the appraiser to utilize her professional judgment. (Tr. at 11199.) Like the decision to utilize a 1% small stock risk premium, her selection of company-specific risk percentages also had a substantial effect on the outcome of her calculations. Roche agreed that, without the 2% risk factor and assuming a 5.59% small stock risk premium, the business valuation post-taking would be $148,905, substantially less than the $888,000 she calculated. (Tr. at 11203, 11241.)

"Experts in disciplines that require the use of professional judgment are less likely candidates for exclusion because challenges may be ultimately viewed as matters in which reasonable experts may differ in exercising their judgment as to the appropriate methodology to employ or the appropriate variable to plug into a calculation." *In re Commercial Fin. Servs., Inc.*, 350 B.R. 520, 528–29 (Bankr. N.D. Okla. 2005) (citation omitted). Nevertheless, "[a]n expert's professional judgment, standing alone and without any supporting facts or data, is insufficient to support opinion testimony." *Antekeier v. Lab. Corp. of Am.*, No. 1:17-cv-786, 2018 WL 3028609, at *1 (E.D. Va. May 1, 2018) (rejecting expert testimony where expert could not cite "reliable data or other facts" that formed his turnover rate estimate) (citing *Alveromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993)). Roche offers no explanation for her conclusions regarding the pre and post-taking company risk factors, making her conclusions merely "unsupported speculation" that must be excluded under Rule 702. *See Cooke*, 991 F.2d.

---

[12] She also admitted that she could point to no authoritative treatises, literature, guide, or industry standard that would support a 2% company specific premium following the installation of a pipeline. (Tr. at 11202.)

at 342 ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded."); s*ee, e.g., Lippe v. Bairnco Corp.*, 99 F. App'x 274, 279 (2d Cir. 2004) (excluding expert testimony where expert could not articulate reasons for why she adopted a percentage she used in her calculation).

To be clear, the Court does not exclude this testimony on the basis of any assumptions Roche made regarding the Dushs' tree farm business, facts she may have chosen to discount in formulating her conclusion, or in differences of opinion in the proper execution of professional accounting judgment, as these categories of dispute would all be proper subjects for vigorous cross-examination. *See Cooke,* 991 F.2d at 342; *see, e.g., In re Joy Recovery Tech.*, 286 B.R. 54, 70 (B.R. N. Ill. 2002). Instead, the Court relies on the fact that Roche was entirely unable to explain the basis for many of her figures and calculations; calculations, the Court adds, resulted in a value amount that was several times that of Roche's own valuations in two other accepted valuation methods. Under these circumstances, the Court finds that Roche's income analysis has an indicia of unreliability that warrants exclusion under Rule 702.

For all of the foregoing reasons, Rover's motion to exclude PIR testimony (Doc. No. 693) is granted in full, and its motion to exclude all testimony of "lost profits" (Doc. No. 691) is granted in part, as set forth above. The expert testimony of Gardner, Koeninger, and Roche shall be excluded.

## V. THE LANDOWNERS' MOTIONS

Because the Court shall exclude all expert testimony on the subject of PIR stigma, the landowners' motion to exclude Rover's rebuttal experts on the subject—Richard D. Huriaux and Michael Israni—is moot. Similarly, because Rover sought to offer the expert testimony of Smith to rebut Roche's business valuation testimony, and that testimony will also be excluded, the landowners' motion to exclude Smith's testimony is also moot.

In their third motion, the landowners challenge the admission of the testimony of arborist Alan Klonowski. In his report, Klonowski opined that Rover's site restoration process will return the land subject to the temporary easement "to the production of high quality Fir Christmas trees." (Doc. No. 695-1 (Report of Alan Klonowski ["Klonowski Report"]) at 10358; Tr. at 11260.) The landowners challenge this conclusion primarily upon the fact that the conclusion is based on the quality of the soil *before* Rover engaged in remediation efforts.[13]

"The Federal Rules of Evidence allow an expert great liberty in determining the basis of his opinions and whether an expert opinion should be accepted as having an adequate basis is a matter for the trier of fact to decide." *Cooke*, 991 F.2d at 342 (citation omitted.) Here, Klonowski's opinion is not mere speculation, but has a factual basis—his inspection of the site on October 27, 2017 and his review of area soil surveys. (Tr. at 11253-54, 11261-12.) To the extent that his opinion is compromised by the fact that he evaluated the site prior to Rover's planned attempts to restore the land, the landowners may properly inquire on cross-examination. *Cooke*, 991 F.2d at 342 ("any weakness in the factual basis of an expert witness' opinion,

---

[13] The Court notes that, it was only recently that Rover completed its remediation efforts, and that it would not have been possible for Rover to offer this expert report prior to the Court's deadline. In fact, at the hearing, the landowners were still waiting on their expert's report as this expert elected to do a post-remediation inspection.

including unfamiliarity with standards, bears on the weight of the evidence rather than on its admissibility") (citation omitted).The landowners' motion to exclude this testimony is denied.

## VI. CONCLUSION

For all of the foregoing reasons, Doc. No. 691 is granted in part, Doc. No. 693 is granted in full, Doc. Nos. 694 and 696 are denied as moot, and Doc. No. 695 is denied.

**IT IS SO ORDERED**.


Dated: September 14, 2018

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**