# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ROVER PIPELINE, LLC, | ) | CASE NO. 5:17-CV-239 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| 10.055 ACRES OF LAND, MORE OR | ) | |
| LESS, IN ASHLAND COUNTY, | ) | |
| | ) | |
| DEFENDANTS, et al., | ) | |

Currently pending in this condemnation case concerning the property owned by defendants Roger and Rita Dush (the "landowners") are two motions in limine filed by plaintiff Rover Pipeline, LLC ("Rover"): (1) motion to exclude the expert report and opinion testimony of Barry Cavanna ("Cavanna") (Doc. No. 755 ["Exp. Mot."]); and (2) motion to exclude the testimony of Rita Dush (Doc. No. 756 ["R. Dush Mot."].) The motions are fully briefed. (Doc. No. 765 ["Exp. Mot. Opp'n"]; Doc. No. 764 ["R. Dush Mot. Opp'n"].)

## I. BACKGROUND

The condemned property that is the subject of the pending motions is part of a larger condemnation action brought, pursuant to the Natural Gas Act ("NGA"), by Rover to accommodate the construction of a pipeline through this judicial district. Both the pipeline project and the landowners' property have been the subject of several previous rulings, and familiarity with these opinions is presumed. For purposes of framing the present motions, therefore, it is sufficient to note that the present parcel being condemned consists of approximately 7.528 acres of land in Wayne County, Ohio. The property is part of a larger tract

that totals more than 100 acres and upon which the landowners and/or related entities operate a Christmas tree farm business, a retail boutique store, and a restaurant. The condemned property includes a temporary construction easement and a smaller permanent easement.

Because all issues relating to immediate possession have been resolved by the parties, the only remaining issues are limited to the amount of compensation that is due the landowners. On August 28, 2018, the Court conducted a hearing on the then-pending motions in limine. On September 14, 2018, the Court issued a memorandum opinion ruling on those motions. (*See* Doc. No. 737 ["MO"].) In a subsequent telephonic status conference, counsel discussed with the Court the existing monitoring program put into place by the Federal Energy Regulatory Commission ("FERC") to mitigate the damage to agricultural land impacted by the construction of Rover's pipeline. (*See* Doc. No. 279-4 (Final Environmental Impact Statement ["FEIS"]); Doc. No. 760-1 (Rover Monitoring Plan) at 12671.) The Court instructed the parties to file trial briefs discussing the impact of the monitoring program on the issues involving the present compensation proceeding. (Doc. No. 760 (Rover Trial Brief ["Rover T.B."]); Doc. No. 761 (Dush Trial Brief ["Dush T.B."]); Doc. No. 767 (Rover Trial Brief Reply ["Rover T.B.R."]; Doc. No. 766 (Dush Trial Brief Reply ["Dush T.B.R."]).)

The parties are scheduled to participate in a mediation session on January 4, 2019, before a private mediator. A final pretrial conference is set for January 7, 2019, and the jury trial in this matter—limited to the determination of compensation—is scheduled to begin on January 14, 2019.

## II.  THE POST-CONSTRUCTION MONITORING PROGRAM

Because the Court finds that the monitoring program adopted by the FERC impacts the

present in limine motions, it is necessary to briefly discuss the program's contours. On February 23, 2015, Rover filed an application with the FERC under Section 7(c) of the NGA to construct and operate the aforementioned interstate natural gas pipeline running through four states, including Ohio. As part of its application, Rover filed an Agricultural Impact Mitigation Plan ("AIMP"), outlining its plan to minimize the negative impact of the pipeline on the affected property. (Doc. No. 559-4 (AIMP).)

### 1. The AIMP and FEIS

Rover committed to compensating agricultural landowners "for a full 3 years (from the start of construction) of productivity on lands impacted by construction." (FEIS at 5690.[1]) It also promised to continue to monitor crop yields for the first five years and compensate landowners if yield reduction in the disturbed areas was higher than originally estimated. Finally, the AIMP provided that Rover "would work with landowners to avoid or minimize impacts on specialty crops, *such as Christmas tree farms*." (*Id.* at 5719 (emphasis added).) According to the FEIS, "[t]ypical mitigation measures [would] include topsoil segregation, *decompaction*, and repair/replacement of irrigation and drainage structures." (FEIS at 5690 (emphasis added); *see* AIMP at 7700–01.)

After conducting an independent environmental review, and after providing for notice and a period for public comment, the FERC staff issued the FEIS. Included within the report was the conclusion that the Rover pipeline would have some adverse and significant environmental

---

[1] Unless otherwise noted, all page number references are to the page identification number generated by the Court's electronic docketing system.

impact on the property through which the pipeline would run, but the report also concluded that this impact would be reduced by the implementation of Rover's proposed mitigation laid out in its AIMP and the additional measures recommended by the FERC staff. (FEIS at 5380.) Specifically, the FERC found that the negative environmental impact would be ameliorated by the portion of Rover's plan that provided for compensation to landowners for crop damage or loss of production, and ongoing monitoring of affected agricultural areas following construction to verify crop yields from the affected areas and return to yield productions similar to those enjoyed in adjacent undisturbed areas. (*Id*. at 5719.)

While generally satisfied with Rover's AIMP, the FEIS was critical of Rover's plan in that it placed the burden on the landowner to monitor and report to Rover any crop yield concerns. The FEIS recommended that, prior to construction, "Rover should file . . . a 5-year post-construction monitoring program to evaluate crop productivity in areas impacted by the construction of the" pipeline. (FEIS at 5690.) The monitoring program envisioned by the FEIS put the onus on Rover to document any crop-related problems. Further, the FEIS provided that,

> [i]f crop yields in restored areas are not similar to or greater than those on adjacent undisturbed croplands, Rover would be required to develop and implement restoration measures in conjunction with appropriate agency personnel and landowners. Additionally, FERC staff would continue to conduct inspections and would impose enforcement or mitigation measures as necessary if after the end of 5 years FERC staff has determined not all restoration is satisfactory.

(*Id*.)

On February 2, 2017, the FERC granted Rover's application for a certificate conditioned on Rover's compliance with certain environmental conditions, including the filing of the five-year monitoring program. (Doc. No. 279-2 (FERC Certification ["Cert."]) at 5237.) Rover subsequently filed its five-year monitoring program in which it committed to conducting surveys

of agricultural areas during each growing season for five years following construction. Under this program, Rover also was required to notify the FERC of any crop-related problems and take corrective actions to address these issues. (Rover Monitoring Plan at 12671.)

### 2. Application of the Monitoring Program

"It is beyond dispute that the FERC has exclusive jurisdiction over the conditions of a FERC certificate[.]" *Am. Energy Corp. v. Rockies Express Pipeline LLC*, No. 2:09-cv-284, 2009 WL 2148197, at *3 (S.D. Ohio July 14, 2009) (collecting cases). "Exclusive means exclusive, and the Natural Gas Act nowhere permits an aggrieved party otherwise to pursue collateral review of a FERC certificate in state court or federal district court." *Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010). Rover acknowledges that if it fails to comply with conditions of the FEIS and the certificate, including the monitoring and restoration of the affected property, this Court has jurisdiction under 15 U.S.C. § 717u to enforce those conditions. *See, e.g.*, *Town of Dedham v. Fed. Energy Regulatory Comm'n*, No. 15-12352-GAO, 2015 WL 4274884, at *2 (D. Mass. July 15, 2015) (noting that "[15 U.S.C.] § 717u is simply an enforcement provision, not an open-ended grant of jurisdiction to the district courts"). Still, it argues that, by seeking damages for the potential reduction in future crop yields that have not yet occurred, the landowners are effectively attempting to bypass the conditions under which the FERC certificate was issued.

The landowners disagree, arguing that Rover's monitoring program is inapplicable to the landowners' property because the monitoring program was limited to annual crops. In support, they rely primarily upon the deposition testimony of Rover's representative, Mark Vedral. In his deposition, Vedral detailed the five-year Rover monitoring and mitigation plan, noting that,

because Christmas trees have a ten-year growth cycle, they would not be accommodated by a five-year plan. (Doc. No. 741-2 (Deposition of Mark Vedral ["Vedral Dep."]) at 12209 (102).[2]) The Court need not reach Rover's argument that this testimony was taken out of context because neither this Court nor the FERC is bound by Rover's representative's opinion as to the applicability of the conditions of the FERC certificate.

Instead, the Court looks to the language of the AIMP, the FEIS, and the FERC certificate. While perhaps not models of clarity, these documents, taken together, demonstrate that the landowners' property was not excluded from the monitoring program. Beginning with the AIMP, Rover's plan defines agricultural land, in relevant part, as "[l]and used for cropland, hayland, pasture land, managed woodlands . . . [and] land on which farm buildings are located[.]" (AIMP at 7696.) The AIMP further defines "cropland" as "[l]and used for growing row crops, small grains, . . . and *Christmas trees*[.]" (*Id.* (emphasis added).) The FEIS, in turn, does not exclude Christmas trees from its discussion of crops. Under the heading of "Organic Farm Lands and Specialty Crops," the FEIS notes that the "[t]he Rover pipeline would cross two Christmas tree farms[,]" as well as an organic cattle farm. (FEIS at 5695.) While the FEIS recommended that Rover file a separate mitigation plan for the organic farm, it made no such separate provision for the Christmas tree farms. (*Id.*) In light of the fact that the FERC understood that the pipeline crossed two Christmas trees farms, it could have, as it had with the organic farm, singled out

---

[2] Because the deposition transcript is printed in a four to a page format, the Court also provides the page number assigned by the transcribing court report in parenthesis.

these properties for different consideration.[3] It chose not to do so. In the absence of any indication that the FERC intended to exclude Christmas tree farms from Rover's mitigation and monitoring obligations, the Court finds that the monitoring program, adopted by the FERC, applies to the subject property.

### III. MOTION IN LIMINE STANDARD

Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Civil Procedure, the practice of ruling on motions in limine "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). Motions in limine allow the court to rule on evidentiary issues prior to trial in order to avoid delay and focus pertinent issues for the jury's consideration. *See United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999); *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

Courts should exclude evidence on a motion in limine only when it is clearly inadmissible. *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). If the court is unable to determine whether certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in proper context. *Id*. Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court. *Goldman v. Healthcare Mgmt. Sys.,*

---

[3] In fact, the only distinction the FEIS makes for a tree crop appears in the beginning of the discussion of Rover's mitigation and monitoring duties, noting that "*[c]rops, other than trees*, would be allowed to be cultivated within both the construction and permanent rights-of-way once construction has been completed." (*Id*. at 5690 (emphasis added).) If anything, this language further demonstrates that the FERC treated "trees" as crops for purpose of the certificate.

*Inc.*, 559 F. Supp. 2d 853, 858 (W.D. Mich. 2008) (citing *United States v. Certain Lands Situated in the City of Detroit*, 547 F. Supp. 680, 681 (E.D. Mich. 1982)). In limine rulings are preliminary, and the district court may change its ruling at trial for any reason it deems appropriate. *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994).

### IV. MOTION TO EXCLUDE EXPERT TESTIMONY

Rover seeks an order excluding the expert reports and opinion testimony of the landowners' soil expert, Barry Cavanna. According to the record, Cavanna visited the subject property on two separate occasions—once before and a second time after the pipeline construction—for the purpose of extracting soil samples. He used a backhoe to extract the soil on his first visit and used a hand-held auger to extract the soil the second time. (Doc. No. 755-1 (Deposition of Barry Cavanna ["Cavanna Dep."]) at 12415–17.[4]) Following each visit, he produced a report containing the results of his analysis of the soil. The first report, dated October 14, 2016, contained no opinions but listed the results of his soil analysis. The report also outlined certain preventative measures that could be taken to reduce the compaction of the soil from pipeline construction. (Doc. No. 755-2 (Cavanna 2016 Report) at 12467.) The second report, dated September 10, 2018, contained the results of his post-construction soil analysis. (Doc. No. 755-3 (Cavanna 2018 Report).) The report found "serious compaction" of the soil in the disturbed areas and offered the opinion that Cavanna's recommendations for soil compaction minimization had not been followed.[5] (*Id*. at 12472–73.)

Rover's motion is governed by Rule 702 of the Federal Rules of Evidence. Rule 702

---

[4] Cavanna testified that he elected to use the auger on his return visit because he did not want to risk using a backhoe near the underground pipeline, itself. (*Id*. at 12417.)

states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R Evid. 702. Rover maintains that Cavanna's testimony fails to satisfy the third (and presumably fourth) element necessary under Rule 702. It claims that Cavanna's methods are unreliable because Cavanna purportedly used "two different methodologies to prepare a 'before and after' analysis" by collecting the first sample with a backhoe and the second sample with an auger.[6] (Expert Mot. at 12390.)

However, the Court finds that Cavanna's testimony fails to qualify under Rule 702 for the more fundamental reason that it will not "help the trier of fact . . . to determine a fact in issue[.]" Fed. R. Evid. 702. The only issue before this Court is the "just compensation" that is owed to the landowners for any diminution in market value and any associated damages. Cavanna opines in his 2018 report that the post-construction soil was seriously compacted. (Cavanna 2018 Report at 12473.) Yet, the FEIS envisions Rover's post-construction mitigation measures to include

---

[5] The landowners do not suggest that Rover was aware of or was required to adopt Cavanna's recommendations for soil compaction minimization.

[6] It is unlikely that this and the other cited deficiencies in Cavanna's reports would justify exclusion under Rule 702. For example, while Cavanna used a different "method" for collecting his "before" and "after" soil sample, Rover does not challenge the reliability of either method. Moreover, Cavanna testified that the *method* he used for analyzing each soil sample was the same. (Cavanna Dep. at 12415–16.) Ultimately, any questions raised by the different soil extraction procedures would go to the weight and not the admissibility of such testimony. *See, e.g.*, *Powell v. Tosh*, 942 F. Supp. 2d 678, 689 (W.D. Ky. 2013) (finding difference in "before" and "after" valuation methods did not render expert testimony unreliable), *adhered to on denial of reconsideration*, No. 5:09-CV-00121-TBR, 2013 WL 1878934 (W.D. Ky. May 3, 2013)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

decompaction of the soil, and there is no way to know at this time if those measures will be ineffective. (FEIS at 5690; *see* AIMP at 7700–01.) In fact, Cavanna testified in his deposition that decompaction might be possible. (Cavanna Dep. at 12446.[7]) Until such time that the results of these measures can be evaluated, there is no way to determine whether compaction of the soil will adversely affect the market value of the property.[8] As such, information and expert testimony on the current compaction of the soil will not aid the jury in their determination of just compensation, and the testimony is subject to exclusion. Rover's motion is GRANTED.

### V. MOTION TO EXCLUDE RITA DUSH'S TESTIMONY

Rover also seeks to exclude the lay testimony of Rita Dush. In her deposition, Rita Dush testified that she believed that, prior to the pipeline construction, a willing buyer would have paid 1.1 million dollars, reasoning that a buyer would recoup the purchase price within two Christmas tree growth cycles (twenty years), based on the likely generation of $500,000 in income from each tree cycle. (Doc. No. 757 (Deposition of Rita Dush ["R. Dush Dep."]) at 12608–10.) She further opines that, following the pipeline construction, the property have been devalued to zero because she believes that Christmas trees, and especially the farm's prized Fraizer Fir trees, will never again be able to grow on the temporary or permanent easement. (*Id*. at 12616–17.) While generally acknowledging the right of a landowner to offer opinion testimony as to the fair market value of condemned property, Rover argues that Rita lacks the qualifications to offer an income approach to valuation. Rover notes that Rita readily acknowledged that she is not a trained

---

[7] Cavanna testified that there is no way to fully restore soil to its pre-compaction condition. (Cavanna Dep. at 12445.) Nonetheless, he also testified that decompaction "might be possible if it is done under suitable conditions. If it is not moist and to the proper depths and things. Again, as long as the original soil is still there that hasn't been excavated." (*Id*. at 12446.)

[8] Indeed, until future crop yields can be measured, it is unknown whether these measures will even be necessary.

accountant, and further notes that she has no information on the going market rate for similar Christmas tree farms.

Like the law in many states, Ohio law recognizes an exception to the general rule that one must be qualified as an expert before offering opinion testimony as to the value of property. Owner-opinion testimony is an estimate of the property's value and is admissible "although [the owner's] knowledge on the subject is not such as would qualify him to testify if he were not the owner." *Smith v. Padgett*, 513 N.E.2d 737, 740 (Ohio 1987) (quotation marks and emphasis omitted). The "owner-opinion" rule presumes that owners of personal or real property are "generally quite familiar with their property and its value," and are "permitted to testify on value by virtue of their ownership alone." *Tokles & Son, Inc. v. Midwestern Indemn. Co*., 605 N.E.2d 936, 940 (Ohio 1992).

However, as the Tenth Circuit has observed, "the owner's qualification to testify does not change the 'market value' concept and permit him to substitute a 'value to me' standard for the accepted rule, or to establish a value based entirely upon speculation." *United States v Sowards*, 370 F.2d 87, 92 (10th Cir. 1966); *see also Baumer v. Franklin Cty. Distilling Co*., 135 F.2d 384, 390 (6th Cir. 1943) (noting that Ohio law does not permit recovery of speculative damages); *MADFAN, Inc. v. Makris*, 86 N.E.3d 707, 714 (Ohio Ct. App. 2017) (reversing jury award of speculative damages); *Dir. of Highways v. Lordstown Realty Co*., 262 N.E.2d 570, 580 (Ohio Ct. App. 1970) ("The limitations on the right to damages resulting from the exercise of the power of eminent domain are that such damages must be actual and not merely speculative or contingent[.]").

Applying the owner-opinion rule, Ohio courts have permitted property and business

owners to offer opinions based upon an income approach, as well as upon a personal valuation of the damage to the residu3 resulting from the condemnation. *See, e.g.*, *Worthington City Sch. Bd. of Educ. v. Franklin Cty. Bd. of Revision*, 17 N.E.3d 537, 544 (Ohio 2014) (holding that an employee of a corporate affiliate could give opinion testimony based on income method of valuation); *Cuyahoga Cty. Bd. of Comm'rs v. McNamara*, No. 95833, 2011 WL 2519514, at *2–5 (Ohio Ct. App. June 23, 2011) (permitting property owner to testify that, in her opinion, her property lost $40,000 in value because the county removed trees from her front lawn). In the present case, Rita Dush is the President and Secretary of Pine Tree Holdings, the portion of the business that grows and sells Christmas trees. (R. Dush Dep. at 12586.) She testified that she based her pre-construction valuation on her understanding of the number of trees that could be grown and generated for sale from the approximately seven and one-half acres of affected land, and the amount of income the sale of those trees would generate. (*Id.* at 12608–12.) Such before-construction valuation testimony would appear to fall within the owner-opinion rule, as it is grounded in the knowledge Rita gained through her personal experience with her property and the related tree farm business.

Nevertheless, her testimony is still subject to exclusion because her after-construction valuation relies on conjecture and speculation that her property will never again grow Christmas trees. Notwithstanding the fact that her own soil expert has testified that decompaction and rehabilitation of the soil is possible, Rita Dush speculates that Rover's mandated monitoring and remediation efforts will fail and that future crop yields will be negatively impacted. While a reduction in crop yield can result in a corresponding drop in market value, it remains to be seen whether crop yields will be affected (or whether Rover's mandated remediation efforts to correct

12

any such deficiencies will be ineffective). Accordingly, any opinion that the property will be devalued as the result of potential future crop reductions would be steeped in speculation.

This testimony would also be irrelevant and subject to exclusion, under Fed. R. Evid. 401 and 402, because the landowners already have a complete remedy for any possible reduction in the productivity of the land due to the condemnation. At trial, the jury will be limited to awarding the property owners "the value of the land taken and . . . [the] damages to the residue of the property." *See Am. Energy Corp.*, 622 F.3d at 606-07 (*citing City of Norwood v. Forest Converting Co.*, 476 N.E.2d 695, 700 (1984)). Given the fact that Rover is obligated by the FERC certificate to remediate and compensate for any reduction in future crop production, an award now for possible crop reduction would amount to an impermissible windfall. Should Rover fail to meet its obligations under the certificate, the landowners may seek enforcement under the Natural Gas Act. *See* 15 U.S.C. § 717u ("The District Courts . . . shall have exclusive jurisdiction of violations of this chapter . . .[and] to enforce any liability or duty created by" the statute.) Because the jury would not be permitted to award damages for any possible future failings by Rover under the certificate, Rita Dush's prediction that Rover will be unable to meet its remediation obligations would not constitute evidence "of consequence in determining the action." Fed. R. Evid. 401. Therefore, it is subject to exclusion under Rule 402.

While Rita Dush is permitted to offer competent opinion testimony as to the valuation of her property, she will not be permitted to offer testimony based on an income approach for future crops. To this extent, Rover's motion to exclude such testimony is GRANTED.

## VI. PRIOR RULING

Such a ruling also requires the Court to revisit its prior in limine rulings. *See Yannott*, 42 F.3d at 1007 (noting that in limine rulings are preliminary and subject to change). As previously noted, the Court did not have the benefit of the parties' briefing on the applicability of the FERC mandated monitoring and remediation program when it issued its September 14, 2018 decision denying the landowners' motion to exclude the expert testimony of Rover's arborist, Alan Klonowski. (MO at 12160; *see* Doc. No. 695 (Dush Mot. to Exclude).) Because the Court has determined that testimony on the likely success of Rover's remediation efforts would be speculative and irrelevant, Klonowski's opinion that Rover's site restoration process will return the land "to the production of high quality Fir Christmas Trees" is also subject to exclusion.

Therefore, the Court REVERSES its prior decision and GRANTS the landowners' motion (Doc. No. 695) to exclude the testimony of Rover's arborist

## VII.     CONCLUSION

For the foregoing reasons, Doc. Nos. 695, 755, and 756 are GRANTED. This case shall proceed to trial on January 14, 2019, at which time the jury will hear relevant testimony on and be permitted to enter an award representing the value of the fair market value of the property taken and the damages to the residue, which, in this case, will be limited to any reduction in the

fair market value to the fee and damages for the lost tree crop on the property at the time of the taking.

**IT IS SO ORDERED**.

Dated: December 28, 2018

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**